IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| TEDDY SCOTT AND MELANIE SCOTT, | ) | |
| | ) | Case No. 4:16-cv-1440-HEA |
| Plaintiffs. | ) | |
| v. | ) | Judge Henry Edward Autrey |
| DYNO NOBEL, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT DYNO NOBEL'S TRIAL BRIEF

Defendant Dyno Nobel, Inc. ("Dyno"), by and through counsel, submits its trial brief setting forth important legal and factual issues anticipated during the upcoming trial.

## INTRODUCTION

Plaintiff Teddy Scott claims he was injured by emissions from one of Dyno's stacks on March 20, 2015. Mr. Scott's wife, Plaintiff Melanie Scott, asserts a loss of consortium claim. Dyno generally disputes the factual and legal bases for Plaintiffs' claims in this matter.

In particular, Dyno disputes that any startup emissions from its nitric acid plant in Louisiana, Missouri, on the morning of March 20, 2015, (1) did not immediately disperse as usual, (2) dropped to the ground, or (3) came in contact with Mr. Scott. Dyno disputes that it was physically possible for any such emissions to have come in contact with Mr. Scott, and that if any such emissions did make contact with Mr. Scott, they were capable of causing any meaningful injury to him. Dyno expects such factual issues to be the subject of drastically contradicting evidence and testimony during the course of trial.

But Dyno also contests that it can be held liable for any alleged injuries to Mr. Scott, even if the facts are as presented by Plaintiffs. Plaintiffs have failed to present sufficient evidence to establish that the events, if they happened as Plaintiffs claim, were sufficiently foreseeable to Dyno such that it owed a legal duty to Plaintiffs. Similarly, Plaintiffs lack sufficient evidence to establish causation in this matter, both based on the lack of foreseeability and the lack of evidence concerning what Mr. Scott was purportedly exposed to.

Likewise, Plaintiffs lack sufficient evidence to sustain a jury verdict on the question of whether Dyno breached an applicable standard of care. This Court's finding that Plaintiffs' sole expert on this issue, Ms. Morningstar, "admittedly has no experience working with nitric acid" establishes that Plaintiffs lack admissible evidence on this issue. (ECF 231 at 12.) It is not sufficient for Plaintiffs to present evidence about the standards of care applicable to chemical plants in "adjacent" industries; rather, under clear Eighth Circuit and Missouri Court of Appeals precedent, without admissible expert testimony about the standards of care applicable to nitric acid plants, Plaintiffs lack sufficient evidence of Dyno's negligence to sustain a jury verdict.

Finally, because Plaintiffs lack sufficient evidence to sustain their punitive damages claims as well, the Court should not permit Plaintiffs to present evidence that is only relevant to punitive damages claims until the Court has ruled on the sufficiency of Plaintiffs' evidence on the merits of those claims. In particular, the Court should not permit evidence of Dyno's finances until it determines that Plaintiffs have satisfied the clear-and-convincing standard for their punitive damages claims.

These and other issues are addressed briefly below.

4855-4066-6906.v2

**BRIEF**

I. **PLAINTIFFS STILL LACK SUFFICIENT EVIDENCE OF FORESEEABILITY TO ESTABLISH EITHER A LEGAL DUTY OR PROXIMATE CAUSE.**

Although the Eighth Circuit ruled on appeal that the question of whether Dyno owed a duty to Plaintiffs was a question of fact, it did so based on Plaintiffs' overemphasis of the weight of the admissible evidence. In particular, the Eighth Circuit relied on three pieces of purported evidence as a basis for finding a question for the jury existed: (1) evidence that the emissions in this case could have fallen to the ground instead of rising as usual because of certain unique conditions that day (i.e., interrupted plant startup); (2) the weather conditions, including purported "evidence the wind was blowing in th[e] direction [of Plaintiff] at the time of the startup" and a purported admission by "Dyno's plant manager . . . that cloud cover could prevent the NOx emissions from rising," and (3) that Calumet may not have been aware of the startup at the time and that Dyno failed to monitor the emissions. *Scott v. Dyno Nobel, Inc.*, 967 F.3d 741, 747 (8th Cir. 2020).

The Eighth Circuit's opinion did not cite to specific facts or evidence in support of these statements, and Plaintiffs cannot present admissible evidence to create genuine questions on most, if not all, of these supposed factual issues. If that is the case at trial, the Court must consider whether the questions of fact the Eighth Circuit believed to exist at the summary judgment stage actually exist at trial. If they do not, judgment as a matter of law for Dyno will be warranted due to the absence of a duty when there is no ability to foresee the possibility of an incident like the one claimed by Plaintiffs.

For similar reasons, Plaintiffs cannot present sufficient evidence of proximate cause to sustain a jury's verdict. As the Eighth Circuit noted in this case, the "foreseeability component of proximate cause refers to whether a defendant could have anticipated a particular chain of events

3

that resulted in injury." *Scott v. Dyno Nobel, Inc.*, 967 F.3d 741, 746 n.2 (8th Cir. 2020). Ultimately, Dyno believes that Plaintiffs will be unable to present sufficient admissible evidence to sustain their burden on causation and their claims should be dismissed on this basis as well.

Similarly, as this Court has noted, to prove causation, Plaintiffs "'must show both that the alleged toxin is capable of causing injuries like that suffered by the plaintiff in human beings subjected to the same level of exposure as the plaintiff, and that the toxin was the cause of the plaintiff's injury.'" (ECF 231 at 26 (quoting *Bonner v. ISP Techs., Inc.*, 259 F. 3d 924, 928 (8th Cir. 2001). Plaintiffs have no scientifically valid evidence regarding the alleged level of exposure to Mr. Scott. Furthermore, Dyno does not believe any expert has conducted a scientifically and legally valid differential diagnosis and, therefore, Dyno maintains its objections to the submission of the case to the jury for those reasons. Although the Court has ruled that Plaintiffs *may* have sufficient expert testimony on these issues, Dyno does not believe the evidence ultimately allowed at trial on these points will be sufficient for Plaintiffs to present a submissible case to the jury on the issue of causation. Dyno expects to renew its summary judgment arguments on these issues via a motion for directed verdict before the case is submitted to the jury.

## II. PLAINTIFFS' PURPORTED EXPERT WITNESS, JENNIFER MORNINGSTAR, MUST BE LIMITED TO HER ADMISSIBLE OPINIONS.

The Court has ruled that Plaintiffs' expert witness, Jennifer Morningstar, may not opine about what an "ordinarily careful nitric acid manufacturer" would have done or that "Dyno failed to use that degree of care that an ordinarily careful nitric acid manufacturer should use under the circumstances." (ECF 231 at 10, 12, 17.) Instead, she is limited to testifying about the duties of an "ordinarily careful chemical plant" or something of a more general nature, which is not nearly as specific. The Court should not permit Plaintiffs to elicit testimony suggesting that Ms.

4

Morningstar's opinions are tailored to or specific to nitric acid plants because the Court has already excluded such testimony.

However, the Court's example of how Ms. Morningstar's standard-of-care testimony might be characterized—as the standards applicable to an "ordinarily careful chemical plant which emits higher-than-normal *toxic chemicals* during a startup process" (ECF 231 at 17)—is problematic because of its one-sided phrasing. The italicized phrase "toxic chemicals" should be replaced by "NOx," for example, since even Plaintiffs' expert admits that the "dose always makes the poison." (Carla Sevin Dep. 50 (ECF 126-1 at 14). Whatever the eventual framing of her opinions, Plaintiffs should not be allowed to suggest that Ms. Morningstar is an expert on nitric acid plants or their startup processes, because, as the Court has ruled, she is not an expert on those issues.

Additionally, the Court has excluded Ms. Morningstar from testifying "regarding Mr. Scott's specific injuries" based on Plaintiffs' representation that she will not be diagnosing Mr. Scott's injuries. (ECF 231 at 17.)

### III. BECAUSE OF THE COURT'S EXCLUSION OF MS. MORNINGSTAR'S OPINIONS ABOUT THE STANDARDS OF CARE APPLICABLE TO DYNO'S NITRIC ACID PLANT, PLAINTIFFS LACK SUFFICIENT EVIDENCE ON THE APPLICABLE STANDARDS OF CARE AND DYNO'S PUPORTED BREACH OF THEM.

Notwithstanding this Court's ruling that Ms. Morningstar can testify generically about standards of care applicable to "chemical plants," the law still requires that Plaintiffs establish the relevant standard of care *specifically* for an "ordinarily careful nitric acid manufacturer," not merely for a generic "chemical plant that releases larger-than-normal [NOx] during a startup process" or some other phrasing. (ECF 231 at 17, 24.)

To establish a breach of the duty of care in professional contexts, "an expert witness is generally necessary to tell the jury what the defendant should or should not have done under the

5

particular circumstances and whether the defendant's actions violated the standards of care of the profession and, thereby, constituted negligence." *Rosemann v. Sigillito*, 956 F. Supp. 2d 1082, 1110 (E.D. Mo. 2013) (quotations and citations omitted). "Expert testimony is required to prove professional negligence when the case deals with issues involving matters outside the common knowledge and experience of laypersons." *Stalcup v. Orthotic & Prosthetic Lab, Inc.*, 989 S.W.2d 654, 657 (Mo. App. 1999).

The Court earlier dismissed Dyno's authority on this point as "only cases involving professional negligence" (ECF 231 at 25), but the Missouri Court of Appeals held the same principles apply outside of the medical malpractice/professional negligence context, including to such issues as the "standard of care in the industry for [a plumber] installing a gasket for a . . . water meter." *Freight House Lofts Condo Ass'n v. VSI Meter Servs., Inc.*, 402 S.W.3d 586, 598 (Mo. Ct. App. 2013). In *Freight House*, the court sustained the expert's opinion as admissible because he testified that, specific to that type of meter, it was industry standard not to modify the gasket in anyway and to place and seal it in certain ways. *Id*. Contrary to this Court's ruling that professional negligence cases are different than ordinary negligence cases on this issue, the *Freight House* court specifically looked to Missouri authority from the medical malpractice context to determine the level of specificity an expert must testify about to establish the standard of care for a plumber. *See id*. at 598 (relying on the Missouri Court of Appeals' opinion in *Hickman v. Branson Ear, Nose & Throat, Inc.*, 256 S.W.3d 120, 123 (Mo. banc 2008), a medical malpractice case, to determine what an expert must testify to establish the standard of care in a plumbing negligence case).

Furthermore, the principles underlying the authority cited by Dyno remain, regardless of whether this is a professional negligence case or not. Plaintiffs must provide expert testimony

6

about the specific standards of care that apply to nitric acid plants because such issues involve complex chemical and mechanical technology that is beyond the understanding of the average juror. Whether the alleged negligence involves brain surgery, installation of a water pump, or starting up a nitric acid plant, a plaintiff must present specific expert testimony about the applicable standards of care that govern each situation to satisfy its burden, regardless of whether the allegedly negligent party can be described as a "professional."

And it is not enough for the expert to opine generally about all manufacturing plants or all chemical plants; rather, the expert must have the qualifications to testify about the specific standards of care applicable to the industry in question. The Eighth Circuit's decision in *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir. 2001), is instructive. In that case, the court recognized that although the plaintiff's "hydrologist specializing in flood risk management, easily qualifies as an expert under Federal Rule of Evidence 702. The real question is, what is he an expert about?" *Id*. The court noted that the expert, Dr. Curtis, while inarguably an expert in flood risk management, "sorely lacked the education, employment, or other practical personal experiences to testify as an expert specifically regarding safe warehousing practices." *Id*. Like Ms. Morningstar's complete lack of experience with nitric acid plants, "Dr. Curtis did not study warehousing practices during his formal education, he has not written about warehousing practices in any of his sixty-plus published articles, and he has never been employed by a warehouseman during any of the twenty-one projects on which he has worked." *Id*. And like Ms. Morningstar, Dr. Curtis "did not compensate for his lack of education or experience about warehousing by, for example, determining or studying the actions of other warehousemen along the Mississippi River in response to this or any other flood." *Id*.

7

Ultimately, the Eighth Circuit "conclude[d] that the district court erred in allowing Dr. Curtis to testify beyond the scope of his expertise and that the inadmissible opinions expressed by him prejudiced Wheeling" because "Dr. Curtis repeatedly offered opinion testimony outside of his area of expertise . . . —namely, whether [the defendant's] actions met the required standard of care for warehousemen." *Id*. The same result should obtain here.

As this Court has already ruled, Ms. Morningstar may not offer opinions about the standards of care applicable to nitric acid plants because "Ms. Morningstar admittedly has no experience working with nitric acid." (ECF 231 at 12.) While the Court is permitting Ms. Morningstar to opine about the supposed applicable standards of care "up to the point" of—***but not actually about those applicable to***—"an ordinarily nitric acid manufacturer," such testimony is categorically insufficient to sustain a jury verdict under Eighth Circuit law and Missouri state court precedent. After hearing Ms. Morningstar's testimony about her lack of qualifications to provide testimony about the standards of care applicable to a nitric acid plant at trial, the Court should reconsider its ruling and dismiss Plaintiffs' claims. Dyno intends to renew its arguments on this point through a motion for directed verdict at the close of Plaintiffs' case.

IV.  **PLAINTIFFS WILL ALSO BE UNABLE TO PRESENT SUFFICIENT ADMISSIBLE EVIDENCE TO SUSTAIN THEIR PUNITIVE DAMAGES CLAIM AND SHOULD THEREFORE NOT BE ALLOWED TO PRESENT EVIDENCE OF DYNO'S FINANCES DURING TRIAL.**

Certain evidence is only admissible if Plaintiffs first establish punitive damages are available—in particular, evidence about Dyno's finances. Accordingly, it is imperative for the Court to determine first whether Plaintiffs have sustained the heavy evidentiary burden on the merits of their punitive damages claim before allowing the potentially prejudicial evidence of Dyno's financial condition into evidence.

4855-4066-6906.v2

In particular, under Missouri law, punitive damages are only available in negligence cases in rare circumstances.[1] *Reel v. Consolidated Inv. Co.*, 236 S.W. 43, 46 (Mo. 1921). Specifically, in a negligence case under Missouri law, "punitive damages are awardable only if, at the time of the negligent act, the defendant knew or had reason to know there was a high degree of probability that the action would result in injury." *Mattingly v. Medtronic, Inc.*, 466 F. Supp. 2d 1170, 1174 (E.D. Mo. 2006) (emphasis in original); *O'Riley v. U.S. Bank, N.A.*, 412 S.W.3d 400, 417 (Mo. Ct. App. 2013) ("Punitive damages are 'so extraordinary or harsh' that they should be awarded only sparingly and must be proven by clear and convincing evidence."). Further, a plaintiff must prove by clear and convincing evidence that "the defendant acted with either an evil motive or a reckless indifference to the plaintiff's rights" before punitive damages can be awarded. *May v. Nationstar Mortg., LLC*, 852 F.3d 806, 814 (8th Cir. 2017); *see also Ford v. GACS, Inc.*, 265 F.3d 670, 678 (8th Cir. 2001) ("Ultimately, the defendant must have acted with some degree of wantonness or bad motive.").

Here, there is no record evidence through which Plaintiffs could satisfy the very high burden necessary to submit punitive damages to the jury in an ordinary negligence case. For example, the evidence cited by the Eighth Circuit on foreseeability/probability would not come anywhere close to establishing by clear-and-convincing evidence that Dyno knew or had reason to know there was a **high degree** of probability that starting up the nitric acid plant would injure a worker on Calumet's site.

To the contrary, the evidence shows that the Dyno Nobel plant has been in continuous operation since the 1960s. During that extensive period, the plant has undergone hundreds of startups just like the startup Plaintiffs claim caused them injury here. There is no record,

---

[1] Recall that the Court dismissed Plaintiffs' strict liability claims, and Plaintiffs elected not to file amended claims.

4855-4066-6906.v2

evidence, or even an allegation, of any injuries related to a startup in more than half a century of plant operations. An injury like the one claimed by Plaintiffs was not foreseeable to Dyno Nobel, let alone "highly probable," as is required for Plaintiffs to recover punitive damages.

Accordingly, the Court should dismiss Plaintiffs' punitive damages claims and preclude introduction of any evidence of Dyno's financial conditions into evidence. Allowing such evidence before the jury without the possibility of punitive damages will irreparably prejudice Dyno. Fed. R. Evid. 403.

Dated:  April 4, 2022

Respectfully submitted,

PARSONS BEHLE & LATIMER

*/s/ Julianne P. Blanch*
Julianne P. Blanch (admitted pro hac vice)
Brandon J. Mark (admitted pro hac vice)

And

William S. Thomas #43229MO
wthomas@gotlawstl.com
GAUSNELL, O'KEEFE & THOMAS, LLC
1717 Park Avenue
St. Louis, Missouri 63104
(314) 257-9800
(314) 257-9801 (Fax)

Attorneys for Defendant Dyno Nobel, Inc.

4855-4066-6906.v2

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of April 2022, I caused to be electronically filed and served the foregoing DEFENDANT'S TRIAL BRIEF with the Clerk of the Court using the Court's electronic filing system, which sent notification of such filing to all attorneys listed on the docket.

/s/  Brandon J. Mark